**IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

RITA C. SABLAN, <u>et al.</u>,       )       APPEAL NO. 89-008
                                     )       CIVIL ACTION NO. 88-366
    Plaintiffs/Appellants,       )
                                     )
        vs.                  )       <u>ORDER</u>
                                     )
VICENTE R. IGINOEF, <u>et al.</u>,   )
                                     )
    Defendants/Appellees.        )
_____)

On July 31, 1990, the appellants filed an appeal of our decision in this case[1] to the Ninth Circuit Court of Appeals ("Ninth Circuit"). Procedural rules to govern such appeals have not previously been addressed by either court. We consider it important to express our views on this subject.

The appellants' appeal raises issues we posed in our Order of August 8, 1990.[2] In view of our decision to transmit the notice of appeal to the Ninth Circuit, we will discuss only two of these issues: (1) whether a substantial federal question has been raised in our decision and, if so, (2) whether appeals from our decisions may be taken as of right or solely by petition for writ of

---

[1]<u>Sablan v. Iginoef</u>, No. 89-008 (N.M.I. June 7, 1990). Rehearing was denied on July 11, 1990.

[2]The appellants and appellee Guadalupe Manglona have filed briefs in response to that order.

551

certiorari.

We believe that our decision does not raise a substantial federal question. But even if it did, it is our opinion that under our Covenant[3] and applicable U.S. law, appeals to the Ninth Circuit may be taken only by petition for writ of certiorari. Accordingly, we regard the appellants' notice of appeal as a petition for writ of certiorari and transmit it as such.

## DISCUSSION

### Does Our Decision Raise a Federal Question?

The appellants filed this action in 1988 to quiet title to property located on the island of Saipan. In the trial court and on appeal, they argued that Article XII of the NMI Constitution ("Article XII") prohibited appellee Guadalupe Manglona from holding a fee simple interest in land in the Commonwealth, despite the fact that Manglona had previously been adjudicated the owner of some of the land at issue.[4]

In our decision, we ruled against the appellants based on the legal principle that a valid final judgment, no matter how erroneous we may think it, is precluded from collateral attack under the law of res judicata. Sablan, slip op. at 11-13.

_____

[3]Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, reprinted in CMC at B-101 (hereafter "Covenant").

[4]Article XII restricts "[t]he acquisition of permanent and long-term interests in real property within the Commonwealth . . . to persons of Northern Marianas descent." Id., sec. 1. Manglona is not a person of Northern Marianas descent, as that term is defined in Article XII, sec. 4. Sablan, slip op. at 5.

The appellants now contend that our decision raises a substantial federal question. They argue that (1) since Article XII is founded on Section 805 of the Covenant,[5] a federal law, and (2) since our decision contradicts previous decisions affirming the constitutionality of Article XII, that therefore (3) a federal question arises. We disagree with this syllogism.

It is true that Article XII is founded on Covenant Section 805. However, the remainder of the first premise is not completely true. While it may be true that decisions implicating certain provisions of the Covenant may raise federal questions, it is not true that all such decisions raise federal questions. See Camacho v. Civil Service Commission, 666 F.2d 1257 (9th Cir. 1982). The second premise is erroneous because it is an inaccurate reading of our decision. Due to the inaccuracies in the premises, the conclusion is unfounded.

It is inaccurate to claim that our decision calls into question the constitutionality of Article XII. Our decision did not contradict previous decisions upholding the validity of Article XII. It merely affirmed the validity of a previous final judgment on res judicata principles.

Even if our decision in some way implicated Covenant Section 805, we cannot see that this necessarily raises a federal question. As the Ninth Circuit itself has observed, not every case which

---

[5]Covenant Section 805 directs the NMI government to ". . . regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent . . . ."

implicates the Covenant is necessarily a case arising under federal law. Camacho v. Civil Service Commission, supra. The Camacho court reasoned that because "[t]he whole government and laws of the Northern Mariana Islands are, in a sense, creatures of the Covenant," to find federal issues in any case implicating the Covenant "would annihilate the distinction between local law and federal law in the Northern Marianas." Camacho, 666 F.2d at 1262. Our decision was based on local law. We do not believe that a federal question arises in this case, even if our decision does implicate Covenant Section 805.

However, assuming arguendo that the appellants are correct in asserting that our decision raises a federal question, we note that that is not the end of the inquiry. In order to be suitable for federal appellate review, the question must be substantial.

Appellants' arguments on the existence of a federal question as mentioned above, rests upon false assumptions and are without merit. See, 2 Fed Proc, L Ed § 3:84 (1981); R. Stern, E. Gressman & S. Shapiro Supreme Court Practice § 3.19 (Sixth ed. 1986). There is no substantial federal question. To reiterate, our decision clearly rested on the principle of res judicata.

### An Appeal as of Right, or by Certiorari?

In examining this issue, it is necessary to consult Covenant Section 403(a):

> The relations between the courts established by the Constitution or laws of the United States and the courts of the Northern Mariana Islands with respect to appeals, certiorari, removal of causes, the issuance of writs of habeas corpus and other matters or proceedings will be

554

governed by the laws of the United States pertaining to the relations between the courts of the United States and the courts of the several States in such matters and proceedings, except as otherwise provided in this Article; provided that for the first fifteen years following the establishment of an appellate court of the Northern Mariana Islands the United States Court of Appeals for the judicial circuit which includes the Northern Mariana Islands will have jurisdiction of appeals from all final decisions of the highest court of the Northern Mariana Islands from which a decision could be had in all cases involving the Constitution, treaties or laws of the United States, or any authority exercised thereunder . . . .

According to an analysis of this provision,

the United States Court of Appeals for the judicial circuit which includes the Northern Marianas (presently the Ninth Judicial Circuit of the United States) will be able to review final decisions of the Marianas Courts where those decisions involve the Constitution, treaties or laws of the United States . . . . In absence of this provision such appeals would have to go directly to the Supreme Court of the United States in Washington, which may be inconvenient for the litigants.

Marianas Political Status Commission, Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands 37 (1975).

Given the pertinent Covenant provision and considering the apparent reason for its adoption, it appears that for the first fifteen years of the existence of an NMI appellate court, the Ninth Circuit's jurisdiction to review appellate decisions may be invoked only by petition for writ of certiorari. This is consistent with United States law concerning review of state court decisions by the U.S. Supreme Court:

Final judgments or decrees rendered by the highest court of a State in which a decision could be had may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute

555

of any State is drawn in question on the grounds of it being repugnant to the Constitution, treaties or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

28 U.S.C. § 1257.[6]

The U.S. Supreme Court has promulgated procedural rules pertaining to review of petitions for writs of certiorari. Because of the absence of Ninth Circuit rules governing review of appeals from this Court's decisions, we believe that it would be appropriate for the Ninth Circuit to consider following such rules. They will be applicable in due course when appeals from our decisions become reviewable only by the U.S. Supreme Court. Covenant Section 403(a); 48 U.S.C. § 1694c.

## ORDER

IT IS HEREBY ORDERED that:

The Clerk of this Court shall transmit the following to the Clerk of the Ninth Circuit Court of Appeals:

    a.  The notice of appeal;

---

[6]It is worthy of note that in 1984, Congress enacted legislation concerning, _inter alia_, relations between appellate courts in Guam and the Virgin Islands and federal courts. 48 U.S.C. §§ 1424-2, 1613. For the first fifteen years following the establishment of appellate courts in those jurisdictions, the Ninth and First Circuit Courts of Appeal, respectively, will have jurisdiction to review their decisions by writ of certiorari. The U.S. Senate Report concerning this legislation indicates that it was patterned after 48 U.S.C. § 1694c, which essentially mirrors the language of Covenant section 403. The Guam and Virgin Islands legislation makes explicit what is implicit in the NMI legislation and the Covenant: federal appellate courts have authority to review this Court's decisions solely by writ of certiorari. Neither 48 U.S.C. § 1694c nor the Covenant contemplate an appeal as of right.

b.   The August 8, 1990 Order;

c.   The briefs of the parties submitted pursuant to the August 8, 1990 Order; and

d.   This Order.

Dated this ___13th___ day of November, 1990, on Saipan, MP.

_____
JOSE S. DELA CRUZ
Chief Justice

_____
JESUS C. BORJA
Associate Justice

HILLBLOM, Concurring:

I join in the majority's statement of the procedural posture of this case. The manner of taking an appeal from our decision to the Ninth Circuit Court of Appeals raises an issue of first impression. The nature of the relationship between the United States and the Northern Mariana Islands (NMI) and in particular the relationship between the NMI and federal courts is involved. I would begin my discussion by noting that there is no rule of the NMI Supreme Court relating to the manner and timing of taking appeals from this Court to the Ninth Circuit.[7] Likewise, I find no rule in Federal Rules of Appellate procedure or the local rules of the Ninth Circuit which provide for the timing and manner of

---

[7] Section 403 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, approved in Act, Mar. 24, 1976, P.L. 94-241, 90 Stat. 263 (48 U.S.C. § 1681) (1976) provides:

(a) The relations between the courts established by the Constitution or laws of the United States and the courts of the Northern Mariana Islands with respect to appeals certiorari, removal of causes, issuance or writs of habeas corpus and other matters or proceedings will be governed by the laws of the United States pertaining to the relations between the courts of the United States and the courts of the several states in such matters and proceedings, except as otherwise provided in this Article provided that for the first fifteen years following the establishment of an appellate court of the Northern Mariana Islands, the United States Court of Appeals for the judicial circuit which includes the Northern Mariana Islands will have jurisdiction of appeals from all final decisions of the highest court of the Northern Mariana Islands from which a decision could be had in all cases involving the Constitution, treaties, or laws of the United States or any authority exercised thereunder ....

taking an appeal from the NMI Supreme Court to the Ninth Circuit. The Rules of the Ninth Circuit, however, do provide in Rule 1-1:

> The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, whenever relevant, are adopted as part of the rules of this court. In cases where the Federal Rules of Appellate Procedure (FRAP) and the Rules of the United States Court of Appeals for the Ninth Circuit (Circuit Rules) are silent as to a particular matter of appellate practice, any relevant rule of the Supreme Court of the United States shall be applied.

Consistent with Covenant section 403,[8] and consistent with the laws of the United States pertaining to the relations between the courts of the United States and the courts of the several states with respect to appeals, certiorari, removal of causes ..., the relevant statute would be 28 U.S.C. 1257[9] which provides:

> Final judgments or decrees rendered by the highest court of a State in which a decision could be had may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the grounds of its

---

[8] In 1977, Congress passed 48 U.S.C. 1694(c) which mirrors the language of Section 403 with the exception of substituting "shall" in lieu of "will" i.e. "will be governed by the laws" appears in Section 403, "shall be governed by the laws" appears in 1694(c); and "will have jurisdiction" in Section 403 reads "shall have jurisdiction" in 1694(c).

[9] The United States is granted in Section 105 of the Covenant legislative power to make laws implementing Section 403 of the Covenant. The only limitation on that power is that such laws may not violate the right to self-government provided in Section 103 and Articles I, II, and III and Sections 501 and 805. It appears that 28 U.S.C. 1257 is a valid exercise of that power and does not violate Covenant Section 103 reservation of "self-government" in the inhabitants of the Northern Mariana Islands.

being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

For the first fifteen years following the establishment of an appellate court of the Northern Mariana Islands;

> the United States Court of Appeals for the judicial circuit which includes the Northern Marianas (presently the Ninth Judicial Circuit of the United States) will be able to review final decisions of the Marianas Courts, where those decisions involve the Constitution, treaties or laws of the United States ... In absence of this provision such would have to go directly to the Supreme Court of the United States in Washington, which may be inconvenient for the litigants. See Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands, February 15, 1975, Marianas Political Status Commission.

Thus, it would appear[10] that the Ninth Circuit review of our decisions should be consistent with the laws of the United States governing the relations of the federal courts and courts of the several states, under the authority of sections 105 and 403 of the Covenant for 15 years in the same manner as the United States Supreme Court would review cases for this Court after that period.

---

[10] In 1984, Congress, in dealing with the authority of an Appellate Court in the Virgin Islands and Guam, provided for review by the First and Ninth Circuits by writ of certiorari of final decisions of the highest court of the Virgin Islands and Guam during a 15 year transitional period. In the Senate Report accompanying the bill, we find that the transition period in both Guam and the Virgin Islands is intended to be the same as that provided for in 48 U.S.C. § 1694(c) which mirrors the language of Section 403 of the Covenant.

In carrying out 28 U.S. C. 1257[11] the U.S. Supreme Court promulgated Rules 12 through 16 which relate to petitions for writ of certiorari.[12] By virtue of Rule 1-1 of the Ninth Circuit, Covenant section 403 and 28 U.S.C. § 1257, Supreme Court Rules 12 thru 16 would be approximate to apply in the absence of any specific federal or Ninth Circuit rule governing the review of

---

[11] Where a body of laws is incorporated by reference as is done by section 403 of the Covenant, it is generally intended that all subsequent amendments are to be applicable. See Sutherland Stat. Const. 51.08 (4th Ed.) (1984).

[12] At the time the Covenant was enacted, laws governing the relationship between the courts of the United States and the courts of the several states differed:

> Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:
>
> (1) By appeal, where is drawn in question the validity of a treaty or statute of the United States and the decision is granted is against its validity.
>
> (2) By appeal, where is drawn in question the validity of a statute of any State on the ground of it being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of its validity.
>
> (3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of a State statute is drawn in question on the ground of it being repugnant to the Constitution, treaties or laws of the United States or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution, treaties, or statutes of or commission held or authority exercised under the United States.

Act July 29, 1970, P.L. 91-3581.

As indicated in the text of this opinion, above, 28 U.S.C. § 1257 was amended in 1988, and the amendment is applicable here. See fn. 4, supra.

cases from this Court which involve the Constitution, treaties, or laws of the United States or any authority exercised thereunder.

I now address plaintiffs' appeal of our decision to the Ninth Circuit.

Rule 13 of the United States Supreme Court provides that a petition for writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort is 90 days. Our judgment in this case was entered on June 7, 1990, and a petition for rehearing was denied on July 11, 1990. The time for review under Rule 13 of the Supreme Court rules made applicable by Rule 1-1 and Covenant section 403 is 90 days from "entry" of judgment or if there is a petition for rehearing from the date of the denial of the petition. Appellant timely filed with this Court a "notice of appeal" rather than a petition for writ of certiorari. The Court had issued an order requiring, inter alia, the appellant to identify the issues involving the Constitution, treaties, or laws of the United States as required by the Covenant Section 403(a). I agree with the majority's decision to treat the notice of appeal filed as a petition for writ of certiorari and, pursuant to our Rule 47, to transmit the appeal to the Ninth Circuit.

Rule 14, of the U.S. Supreme Court Rules, sets out the required content of the petition for a writ of certiorari. This Order deals with two of the criteria in that Rule: "The statutory provision believed to confer on the (Ninth Circuit) jurisdiction to review this judgment or decrees by writ of certiorari." and, "The constitutional provisions, treaties, and statutes involved."

Having received the briefs of the parties on these matters (which I believe were totally inadequate), and in light of the importance of the matters involving the political union of the United States with the Northern Mariana Islands as it relates to the judiciary, I feel compelled to supplement this record regarding the above stated matters.[13] For the reasons that follow, I join the majority in questioning the existence of any federal issue to which review to the Ninth Circuit lies within the meaning of Covenant section 403(a).

### THE RELATIONSHIP OF THE NMI SUPREME COURT AND THE COURTS ESTABLISHED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES

Covenant section 403 generally provides for review from this Court to the United States Supreme Court. During the first 15 years, review is to the Ninth Circuit. That review is in accordance with the laws which regulate review of decisions of the courts of the several states by the Supreme Court[14] in all cases involving the "Constitution, treaties, or laws of the United States, or any authority exercised thereunder ...."

A.  **THE BASIS AND EXTENT OF UNITED STATES LEGISLATIVE AND JUDICIAL AUTHORITY IN THE NORTHERN MARIANA ISLANDS.**

I begin by noting that the United States did not obtain any

---

[13]  See _Ihihi, et al. v. Kahaulelio_, 263 F. 817, 818.

[14]  As I later note, these laws must not violate Covenant section 103.

interest in or control over the NMI by conquest or by treation of cession.[15] The relationship is unique and sui generis; all authority exercised by the United States over the NMI emanated from the United Nations Charter and Trusteeship Agreement.[16] The primary purpose of both documents was to eliminate colonies as a fruit of war. The objective of the Charter is the culmination in democracy or self-government for all inhabitants of occupied territories, such as the NMI. Various resolutions of the United Nations deal with and have defined "minimum" acceptable self-government. One such minimum level of self-government is full.

---

[15] See In the Treaty of Peace (Treaty of Paris of 1898), 30 Stat. 1754, T.S. No. 343, Spain ceded Puerto Rico and Guam to the U.S.

The Virgin Islands were ceded to the U.S. by the King of Denmark in the Treaty for Cession of Danis West Indies. Sug. 4, 1916, 1706, T.S. No. 369.

In the case of American Samoa, the island chiefs ceded the territory to the U.S. in two separate documents, The Treaty of Cession of Tutuilla and Aunuu, April 17, 1900, and The Treaty of Cession of Manu'a Islands, July 16, 1904.

Hawaii was simply annexed by Congressional Act. See e.g., Act of April 30, 1900, 31 Stat. 141.

A comparison of the terms and process leading to those treaties and the act of annexation of Hawaii with the Covenant demonstrates the unique nature of the relationship of the NMI with the United States.

[16] For a history of the Commonwealth and a discussion of the relationship of the United States, see The Political Relationship Between the United States and Pacific Islands Entities: The Path to Self-Government in the Northern Mariana Islands, Palau, and Guam, 31 Harv. Int. L.J. 257, and The Final Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States (1987).

integration of the trust territory into the Administering Authority by granting voting rights and full participation in the government of the Administering Authority on an equal basis with all the inhabitants of that Administering Authority.[17] The inhabitants of the NMI have **no** participation in the government of the United States. The inhabitants do not elect members of the United States House of Representatives, the United States Senate, or the President. No member of the United State's judiciary is selected, appointed, or confirmed by persons for whom the inhabitants of the NMI vote. It is thus clear that the inhabitants of the NMI do not possess rights equal to the inhabitants of the United States, the Administering Authority.

Since the NMI has not been integrated into the United States, what is the relationship that assures that the democracy and self-government[18] guaranteed by Article 76 of the United Nations Charter

---

[17] See <u>General Assembly Resolution 1541 Annex</u> (Principles VIII & IX), 15 U.N. GAOR Supp. (No. 16) at 30 U.N. Doc. A/4684 (1960).

[18] Without the Charter and the Trusteeship Agreement's requirement of "self-government or independence," the fears expressed by Mr. Justice Harlan in his dissenting opinion in <u>Hawaii v. Mankichi</u>, 190 U.S. 197, 240 (1903) would have been realized:

> If the principles now announced should become firmly established, the time may not be far distant when, under the exaction of trade and commerce, and to gratify an ambition to become the dominant political power in all the earth, the United States will acquire territories in every direction, which are inhabited by human beings, over which territories, to be called 'dependencies' or 'outlying possessions,' we will exercise absolute dominion, and those inhabitants will be regarded as 'subjects' or 'dependent peoples,' to be controlled as Congress may see fit, not as the Constitution requires, nor as **the people governed may wish.** This will be

and Article 6 of the Trusteeship Agreement exists in the political union between the NMI and the United States?[19]

The only document other than the United Nations Charter and Trusteeship Agreement dealing with the relationship of the NMI to the United States is the Covenant. The Covenant in its preamble and the Congressional resolution approving the Covenant, appearing in 48 U.S.C. § 1681, declare that the Covenant is intended to carry out the Charter and Trusteeship Agreement. How does the Covenant, guarantee democracy and self-government, and in particular, how this requirement of democracy and self-government affect the relationship between the NMI Supreme Court and the Ninth Circuit, I believe, is before this Court.

The Covenant in section 101 creates a political union and the definition and terms of that political union are set forth in the following 10 Articles. The basic terms are in sections 102, 103, and 104. These three sections provide guidelines that help define the union in a manner which establishes the necessary requirement

---

engrafted upon our republican institutions, controlled by the supreme law of a written Constitution, a **colonial** system entirely foreign to the genius of our Government and adherent to the principles that underlie and pervade the Constitution. (Emphasis added.)

[19] As part of the Trusteeship, the NMI was afforded all the fundamental freedoms adopted by the United Nations, including Article 7 (equal protection) and Article 21 (the right to participate in the government through freely chosen representatives) of the International Bill of Human Rights. The Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res 217A (III), U.N. Doc. A/810 at 71.

of NMI democracy and self-government.

Section 102 provides that the Covenant, together with those provisions of the Constitution, treaties, and laws of the United States incorporated by reference therein are the "supreme" law of the relationship between the Northern Mariana Islands and the United States. Section 103 basically reserves to the People of the Northern Mariana Islands the right of "self-government" over local and internal matters while Section 104 grants to the United States control over foreign affairs and defense. The remainder of the Covenant, with a few exceptions[20] carries out this theme. Nowhere is the breadth of this reserved right of "self-government" more apparent than in Section 501. This Section incorporates by reference certain parts of the United States Constitution applicable to the Government of the Northern Mariana Islands, and also provides that:

> Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands will be applicable only with the approval of the Government of the Northern Mariana Islands and of the Government of the United States.

Section 103, when read in conjunction with Section 501, demonstrates the unique political relationship created by the Covenant. The Northern Mariana Islands is the only participant in

---

[20] See Section 2 of Amendments 13, 15, 19, and 26 of the United States Constitution incorporated by reference in section 501 of the Covenant. See also Covenant sections 502(b), 503, 604, and 606(b) for other examples.

a political union with the United States which has to consent to application or incorporation of provisions and amendments to the United States Constitution before they become effective.[21] In contrast, the state and federal governments are bound by amendments the minute they become effective.[22]

In principle then, the relationship seems clear cut. Any matter involving foreign affairs or defense the United States controls and any matter not involving foreign affairs and defense is a matter of self-government reserved to the inhabitants of the NMI.

Although appearing to be simple, defining the relationship has proven difficult. The difference in size and power of the United States as opposed to the NMI means that despite the terms of the Covenant, the United Nations Charter, and Trusteeship Agreement, the United States could define its power as broad as its institutions allow. The only theoretical restraint on the United

---

[21] The fact that the highest and most basic of all laws, the U.S. Constitution must be consented to before being incorporated by reference or made directly applicable to the NMI supports the conclusion that "lesser" laws such as federal statutes and regulations infringing on "self-government" also require consent by the people themselves or their elected representatives before being effective. The mechanism for consenting or resolving differences is Covenant section 902.

[22] It should be noted that states have two voices in approving Constitutional Amendments other than by Constitutional Convention. First, their elected house and senate members vote on the amendment and then the state legislatures ratify them. The people of the Northern Mariana Islands have no vote in the United States House or Senate, nor does their legislature "ratify" Constitutional Amendments.

States is public conscience and opinion and the integrity of its institutions, including the courts. The document establishing and governing the political union is only as good as the "good faith" of the larger and more powerful partner in that Union.

Faced with this reality, this Court's primary obligation is its oath to uphold the Covenant, including protecting the rights of the inhabitants set forth in section 103 of the Covenant.[23] We approach the relationship of our Supreme Court with that of the Federal Judiciary with these considerations in mind.[24]

## B. THE LEGISLATIVE AUTHORITY OF THE UNITED STATES TO IMPLEMENT SECTION 403.

The legislative authority[25] of the United States to implement

_____

[23] This Court's oath to uphold and support the Covenant is different than the oath of the Federal or State judiciary which is to the United States Constitution. U.S. Const., Art. V. The judiciary of the NMI swears or affirms allegeance to the Covenant and only those constitutional and statutory provisions incorporated or made applicable thereby.

[24] In Wabol v. Villacrusis, No. 89-005 (NMI 12/11/89), we respectfully disagreed with the Ninth Circuit over whether the people of the NMI through their elected officials control the course of appeals on local law or whether an unelected Congress can override this act of democracy and self-government by the inhabitants of the NMI.

[25] Covenant section 501 does not make applicable in the Northern Mariana Islands the Necessary and Proper Clause, Interstate Commerce Clause, or the Territorial Clause of the United States Constitution. These are the primary provisions of the Constitution which allow Congress to legislate on local and internal matters in the several states and classic territories. The Covenant does, however, incorporate the limited legislative powers to carry out the 13th, 15th, 19th, and 26th Amendments as Section 2 of those amendments are incorporated into Section 501 of the Covenant.

Section 403 of the Covenant is found in Covenant Section 105 which provides:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands .... In order to respect the right of self-government guaranteed by this Covenant, the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I (including Section 103), II, and III and Sections 501 (the incorporation by reference of certain provisions of the United States Constitution) and 805 may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

The primary restraint on the legislative power of the United States then requires defining "self-government" inasmuch as the legislative power of the United States in the NMI is limited to that which does not modify or violate "self-government" found in section 103.

The analysis begins by noting that Covenant section 103 reserves to the people (not the government) of the Northern Mariana Islands the right of "self-government." The people govern themselves chiefly by exercising their voting rights. Accordingly, I conclude that "self-government" and the right to vote go hand-in-hand. The United States Supreme Court has provided a definition of the right to vote which can also serve as a starting point for the definition of the right of "self-government." Justice Warren in Kramer v. Union Free School District No. 15, 395 U.S. 621 (1969), found that the plaintiff's right to vote was infringed because he was not allowed to participate in an election that involved matters he was substantially interested in and which substantially affected

570

him. I, therefore, define self-government as the right of the NMI to determine matters in which NMI inhabitants are substantially interested in and affected by. Since NMI voters do not (and cannot) participate in Federal elections, self-government must confer legislative authority in the persons they do vote for, the NMI government.

In light of the Covenant's grant to the United States of authority over foreign affairs and defense in section 104, I find that section 103 reserved to the people of the Northern Mariana Islands authority over all internal matters in which the inhabitants are substantially interested and which substantially affect them, so long as those matters do not primarily involve foreign affairs or defense.[26]

Independent grounds exist to preserve the right of self-government to the people of the Northern Mariana Islands. The

---

[26] The Covenant has a few specific exceptions to this rule. The Covenant also allows Congress to make applicable:

(a) except as otherwise provided in Section 506, the Immigration and Naturalization laws of the United States;

(b) except as otherwise provided in Subsection (b) of section 502, the coastwise laws of the United States and any prohibition in the laws of the United States against foreign vessels, landing fish, or unfinished fish products in the United States; and

(c) the minimum wage provisions of Section 6, Act of June 25, 1938, 52 Stat. 1062, as amended.

See also, Covenant section 501 incorporating by reference the 13th, 15th, 19th, and 26th amendments' legislative power.

571

right of self-government, defined as the right to elect those persons who govern, is so fundamental that it constitutes a peremptory norm of international law or jus cogens from which no derogation is permitted whether by treaty or domestic legislation. See generally Committee of U.S. Citizens in Nicaragua v. Reagan, 859 F.2d 929, 939, 940 (D.C. Cir. 1988). See also Jus Cogens: Compelling the Law of Human Rights, 12 Hastings Int'l. and Comparative Law Review, 411 (1989). The application of the doctrine of jus cogen to protect the right of self-government is particularly appropriate in the CNMI. As part of Trusteeship, the NMI was afforded all fundamental freedoms adopted by the United Nations, including Article 7 (equal protection) and Article 21 (the right to participate in government through freely chosen representatives) of the International Bill of Human Rights and the United Nations Charter. Art. 7 and Art. 21 are peremptory norms of international law and the application of federal law in derogation of self-government would violate such peremptory norms.

Having concluded that Congress may enact legislation carrying out its authority under Section 403(a) which does not modify or violate Covenant section 103 reservation of the right of self-government and having defined "self-government" I conclude that 28 U.S.C. § 1257 is a valid exercise of that power provided appellate review is limited to matters involving authority granted to the United States by the Covenant.

572

## C. **APPLICATION OF ARTICLE III AND SUPREMACY CLAUSE, OF THE UNITED STATES CONSTITUTION.**

To complete the analysis of the relationship of this Court to the Federal Courts, we must determine if other authority, other than section 403, exists governing the relationship.

The Federal Courts are granted final authority "over" state courts because of the Supremacy Clause of the United States Constitution and the application of Article III of the United States Constitution. Article III grants the Supreme Court jurisdiction to decide all "cases, arising under this Constitution, [and] the Laws of the United States." Ableman v. Booth, 16 L.Ed. 169.

Article III and the Supremacy Clause[27] of the United States Constitution (including the provision "and the Judges in every States shall be bound thereby,") do not apply in the NMI and do not govern the relationship between the Northern Mariana Islands and the United States. See Covenant, section 501. These provisions grant the federal courts final authority over state courts in the sense that federal courts decide what is or is not a federal question and can ultimately decide that federal question. In lieu of the Supremacy Clause, Covenant section 102 provides:

The relations between the Northern Mariana Islands and

---

[27] This Constitution and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, and any Thing in the Constitution or Laws of any State to the contrary notwithstanding. U.S. Const., Supremacy Clause, Art. VII, cl. 2.

the United States will be governed by <u>this Covenant which, together with</u> those provisions of the Constitution, treaties and laws of the United States <u>applicable</u> to the Northern Mariana Islands will be the supreme law of the Northern Mariana Islands. (Emphasis added.)

The Covenant's "supremacy clause" does not contain the "judicial supremacy" section found in the U.S. Constitution's Supremacy Clause. The unique relationship and devision of authority created by the Covenant, whereby the people of the Northern Mariana Islands retained authority over local and internal matters in section 103 and granted the United States authority over foreign affairs and defense in section 104 prevents either judiciary controlling the other in any manner other than that provided for in Article IV of the Covenant.[28]

D. **DOES THERE EXIST IN THIS REQUESTED REVIEW ANY SUBSTANTIAL ISSUE INVOLVING THE CONSTITUTION, TREATIES, OR LAWS OF THE UNITED STATES, OR ANY AUTHORITY EXERCISED THEREUNDER?**

Justice Borja requested the parties to identify and brief

... what is the issue(s) that involve(s) the Constitution, treaties or laws of the United States (a federal question), as required under section 403(a) of our Covenant?

The briefs of the parties on this and other issues involving this review were woefully lacking. However, in attempting to understand plaintiffs/appellants' argument, they appear to contend

---

[28] If differences in judicial opinions occur, the Covenant provides for resolution of differences, pursuant to Covenant section 902.

574

that Covenant section 805 was involved in that the effect of our decision in this case is that Guadalupe P. Manglona, a person not of NMI descent, obtains title of land in violation of Covenant section 805. The plaintiffs/appellants also argue that section 805 "but for the Covenant" violates due process and equal protection.

> A further issue is that since the Commonwealth constitutional provision is in clear led arrogation (sic) of due process and equal rights (sic) provisions of the United States Constitution and as embodied in many federal laws, and in light of this court decision in this case permitting persons who are not of Northern Marianas descent to hold real property inspite (sic) of direct attacks upon such holding; whether Article XII should simply be struck down since this court's ruling renders it effectively meaningless and sec. 805 of the Covenant may also be considered as a legal nullity.

Appellants' brief per order of August 8, 1990, at 5.

E. **WERE QUESTIONS INVOLVING COVENANT SECTION 805, EQUAL PROTECTION OR DUE PROCESS A SUBSTANTIAL ISSUE IN THIS CASE?**

Any NMI case involving land ownership could theoretically involve Covenant section 805 and raise equal protection or due process concerns. The issue, however, is not whether the case involves these Covenant provisions but whether such issue raises a substantial federal question. Stated differently, was the application or construction of section 805, equal protection or due process determinative to the outcome of this case?

The record before us indicates that equal protection and due process were never argued or briefed concerning the merits of this case. These arguments appeared in their brief concerning jurisdiction and the review process. Application or construction

575

of section 805 was not determinative to the outcome of this case. I will not repeat the text of our opinion in this order, but it is clear that res judicata prevented us from a rehearing of decisions which had the effect of enforcing a 1977 divorce decree. In 1977, neither Article 12 or Covenant section 805 were in effect.[29] There is plainly no substantial question involving Article 12 or Covenant section 805 and in this I join the majority.

F.   **DO THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF THE UNITED STATES CONSTITUTION APPLY OF THEIR OWN FORCE IN THE NORTHERN MARIANA ISLANDS AND THUS CONSTITUTE A BASIS FOR REVIEW UNDER SECTION 403(a)?**

The Supreme Court has held that the first ten amendments to the United States Constitution do not vest rights in individuals against any government but only the Federal Government. Mr. Justice Marshall in Barron v. The Mayor and City Council of Baltimore, 8 L.Ed. 672, 674, held that protections against the state governments was left to the people of each of the states and that each state was free to fashion their own bill or rights. If the first Ten Amendments, including the Fifth Amendment inherently, or of their own force, apply **only** to the Government of the United States, what provision of the United States Constitution makes them applicable to governments other than the United States? The most obvious is the Fourteenth Amendment. Due Process limitations on the state's power have been applied via the Fourteenth Amendment.

---

[29] See Section 1003 which makes Covenant section 805 effective on a date determined and proclaimed by the President of the United States which occurred on January 9, 1978, in Presidential Proclamation No. 4534 signed by Jimmy Carter.

<u>Cantwell v. Connecticut</u>, 310 U.S. 296 (1940). Is the NMI a State within the meaning of the Fourteenth Amendment? This inquiry requires analysis of the relationship between the Northern Mariana Islands and the United States.

I begin with the most obvious: citizens and residents of the Northern Mariana Islands, unlike citizens of several states do not <u>vote</u> for, nor are they <u>represented</u> by, members in the United States House of Representatives or Senate. The Northern Mariana Islands did not enter into a political union with the United States on an "equal footing"[30] with any state.[31] I <u>conclude that the Northern Mariana Islands is not a State within the meaning of the 14th Amendment</u>.[32] However, that conclusion is not the end of the inquiry.

G.   <u>IS THE GOVERNMENT OF THE NORTHERN MARIANA ISLANDS AN INSTRUMENTALITY OF OR ACTING ON BEHALF OF THE UNITED STATES SO AS TO INVOKE STATE ACTION IN THIS CASE REQUIRING THE APPLICATION OF DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED STATES CONSTITUTION?</u>

As shown above, the Government of the Northern Mariana Islands

---

[30] Equal footing is a constitutional requirement of admission to the Union. See <u>Mumford v. Wardwell</u>, 73 U.S. 423 18 L.Ed. 756.

[31] As will be shown below, express provisions of the Covenant demonstrate that the Northern Mariana Islands cannot be viewed as a state or identical to a state. See Article II, sections 501 and 805, for example.

[32] See also, cases involving Indian Tribe Government, <u>Santa Clara Pueblo v. Martinez</u>, 346 U.S. 49 (1978), <u>Board of Commissioner v. Seber</u>, 318 U.S. 705 (1943), <u>Native American Church of North America v. Navajo Tribal Council</u>, 272 F.2d 131 (10th Cir. 1959).

is not the federal government and is not a state government. However, the issue arises as to whether the Northern Marianas is an instrumentality of either of the foregoing governments. The United States Constitution (of its own force) has been made applicable to instrumentalities of both the Federal and State Governments.[33] To determine if the Northern Mariana Government is such an instrumentality, we must analyze the extent of authority retained by the Northern Marianas pursuant to section 103 of the Covenant. Does the Federal Government have sufficient authority to control the internal affairs of the Northern Mariana Islands to characterize the Commonwealth as an instrumentality.[34]

We have demonstrated that the only legislative authority the United States is derived from is Covenant section 105. The Territorial, Interstate Commerce Clause, Supremacy Clause, and Necessary and Proper Clause do not apply.[35] Section 105 limits the legislative authority to matters authorized by the Covenant and which do not violate self-government. I have defined "self-government" in section 103 as the right of the inhabitants to govern the local and internal affairs of the NMI, free of United

---

[33] See Baldwin v. New York, 399 U.S. 66 (1970), Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), Duncan v. Louisiana,. 391 U.S. 145 (1968).

[34] If Congress had plenary power, the NMI would clearly be an instrumentality. See Ngiraingas v. Sanches, 1990 W.L. 48272 (U.S.) and 858 F.2d at 1361, Fn. 1.

[35] See Covenant section 501.

States control. I, therefore, conclude that the NMI, being neither a part of the federal nor state government, is not an instrumentality of either. The Due Process Clause and the 14th Amendment do not apply of their own force to actions of the Government of the NMI and cannot serve as a basis of further appellate review in this case.[36]

## H. IF THE FIFTH AND FOURTEENTH AMENDMENTS DO NOT APPLY OF THEIR OWN FORCE, WHAT IS THE FUNCTION OF SECTION 501 OF THE COVENANT?

The U.S. Congress acting alone or the NMI acting with it cannot amend the United States Constitution. The Constitution either applies of its own force or does not apply at all. Only an amendment to the Constitution thru the processes of Article V of the Constitution can make the Constitution applicable to an area which it by its own terms is not applicable. Section 501 states in 501(b):

> The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity and power of the Congress of the United States to consent to Sections 203 (denial of one man, one vote in the NMI Senate), 506 and 805.

If the equal protection and due process amendments do not apply of their own force to the Government of the Northern Mariana

---

[36] This is not to say a litigant cannot attack the Covenant itself on the basis of its constitutionality. However, if any fundamental provisions were invalid, the Political Union itself is at stake.

Islands, does Covenant section 501 incorporate by reference these provisions of the United States Constitution? It is clear that those provisions of the United States Constitution provided for in Covenant section 501, although not applicable of their own force are incorporated by reference in Covenant section 501. The remaining issue concerns whether judicial interpretation by United States courts occurring subsequent to January 9, 1978, are to be followed.[37] Or, said another way, are the interpretations given by the United States Courts binding on this Court?[38]

Covenant section 501 incorporates by reference the Fifth and Fourteenth Amendments of the United States Constitution. The Government of the Northern Mariana Islands is to be considered a State government for purpose of its application. Covenant section 501. The section further provides:

> Other provisions of or amendments to the Constitution of the United States which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with the approval of the Government of the Northern Mariana Islands and of the Government of the United States.

---

[37] See Sutherland Stat. Const. 51.08 at 516:

A statute of specific reference incorporates the provisions referred to from the statute as the time of adoption without subsequent amendments.

The same logic would follow regarding Judicial Interpretations.

[38] A discussion of this subject also raises the issue of whether in reviewing a decision of the NMI Supreme Court, the Courts of the United States can modify any decision of this Court which results in a violation of the United States Constitution even if authorized by the Covenant.

The theme of section 501 is that the provisions of the Constitution made applicable by section 501 were known and approved at the time the Covenant was voted on and any subsequent amendment or other change must be consented to and approved by the Government of the NMI. This is consistent with the basic purpose of the Covenant which is to create a political union preserving self-government in the people of the Northern Mariana Islands. Is self-government <u>better served</u> by the Federal Courts determining the meaning of section 501's application to the Northern Mariana Islands, or is self-government better served by having this Court determine the meaning of section 501. It appears self-government is better served with this Court determining the meaning of Covenant section 501.

H. <u>IS ALL OR PART OF THE COVENANT ENCOMPASSED IN THE PHRASE CONSTITUTION, TREATIES OR LAWS OF THE UNITED STATES OR ANY AUTHORITY EXERCISED THEREUNDER WITHIN THE MEANING OF 403(a).</u>

Review by federal appellate courts of decisions of this Supreme Court is limited to issues involving the Constitution, treaties or laws of the United States. Is only a part of or does the entire Covenant constitute a federal law?

A review of specific provisions of the Covenant demonstrate that the Covenant is not synonymous or encompassed within Constitution, treaties or laws of the United States. In Section 102, we find:

> The relations between the Northern Mariana Islands and the United States will be governed by this <u>Covenant which</u>

together with those provisions of the Constitution, treaties and laws of the United States will be the supreme law of the Northern Mariana Islands.

In Section 202, we find:

The courts established by the Constitution or laws of the United States will be competent to determine whether the Constitution and subsequent amendments thereto are consistent with this Covenant and with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands.

Section 203(d) provides:

The Constitution and laws of the Northern Mariana Islands may vest in such courts' jurisdiction over all causes in the Northern Mariana Islands over which any court established by the Constitution or laws of the United States does not have exclusive jurisdiction.

Section 204 states:

All members of the legislature of the Northern Mariana Islands and all officers and employees of the Government of the Northern Mariana Islands will take an oath or affirmation to support this Covenant, those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands....

Section 402(a) and (b):

The District Court for the Northern Mariana Islands will have the jurisdiction of a district court of the United States, except that all causes arising under the Constitution, treaties, or laws of the United States, it will have jurisdiction ....

Section 504 of the Covenant creates a Federal Laws Commission which is to recommend to Congress concerning the application of federal laws in the Commonwealth.[39] In formulating its recommendations,

---

[39] See the Final Report of the Federal Laws Commission.

582

the Commission will take into consideration the potential effect of each law (federal law) on local conditions within the Northern Mariana Islands, the policies embodied in the law and the provisions and purposes of this Covenant.

In Section 805, we find:

> Except as otherwise provided in this Article, and notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands, the Government of the Northern Mariana Islands, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency.
>
> (a) will until twenty-five years after the termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent; and
>
> (b) may regulate the extent to which a person may own or hold land which is now public land.

In Section 903, we find:

> Nothing herein shall prevent the presentations of cases or controversies arising under this Covenant to courts established by the Constitution or laws of the United States. It is intended that any such cases or controversies will be justiciable in such courts and that the undertakings by the Government of the United States and by the Government of the Northern Mariana Islands provided for in this Covenant will be enforceable in such courts.

583

In Section 1004.

> (a) The application of any provision of the Constitution or laws of the United States which would otherwise apply to the Northern Mariana Islands may be suspended until termination of the Trusteeship Agreement if the President finds and declares that the application of such provision prior to termination would be inconsistent with the Trusteeship Agreement.

As the above sections clearly demonstrate, the Covenant is not a part of the U.S. Constitution nor is it synonomous with that document. The issue remains whether the Covenant is a law or treaty of the United States. The Covenant cannot be such a law or treaty. The Covenant contains provisions which the United States Congress could not enact because such provisions would be unconstitutional. See Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). Provisions which, if enacted by the United States Congress, would raise serious constitutional considerations, include Section 203 which mandates the NMI Senate not be based on the principle of one man one vote, Section 805 which is based on racial classifications and 501 which limits the application of the U.S. Constitution in the NMI. The Covenant, a unique document, is what it is. It is primarily a document creating a political union reserving and granting authority pursuant to its expressed terms. Where authority is reserved to the people of the NMI, they are empowered to exercise that authority as they deem proper even if the United States Congress could not enact similar legislation.

Review under section 403(a) is not limited to substantial issues involving "Constitution, treaties and laws," but also

584

includes "... or any authority exercised thereunder." Therefore, if a section of the Covenant incorporates by reference a federal law and the United States is exercising authority under that Section and law, then review lies to the Ninth Circuit. Section 805 of the Covenant is not one of those sections under which the United States is exercising authority under a law of the United States. In fact, the opposite is true. Section 501 which incorporates by reference certain provisions of the United States Constitution also limits the application of those provisions of the United States Constitution which would otherwise invalidate Sections of the Covenant, such as sections 203 and 805, *supra*. Section (b) of Section 501 states:

> The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to Sections 203, 506, 805 and 501.

Thus, each relevant provision of the Covenant[40] must be

---

[40] The Covenant governing the relationship and political union between the United States and the NMI is a unique document. As the United States Constitution defines or limits the powers of the Federal Government in the political union with the United States, so does the Covenant in sections 103 and 104. In addition to the above, although not containing all matters which govern the NMI, the Covenant basically sets up the Government of the NMI. In the Covenant, we have a combination of Federal and States Constitutions. From and interpretative point of view then, those provisions under which the United States has exercised authority such as section 104 would be amenable to federal appellate review. Those which deal with local and internal matters, such as sections 203(c) and 805, the United States is not and cannot exercise authority (see section 105) as such there is no appeal from this Court.

analyzed on a case-by-case basis to determine if an appeal lies. Here, the relevant provision of the Covenant section 805 is a matter under which the United States can exercise no statutory or legislative authority (see section 105), thus there is no authority exercised by the United States under the Constitution, treaties or laws of the United States and no federal appellate review is available under section 403 (a).

In light of the conclusion that no substantial question of equal protection or due process is involved, nor is there a substantial or decisional issue regarding Covenant section 805, and alternatively that matters arising under Covenant section 805 are not matters involving the Constitution, treaties or laws of the United States or any authority exercised thereunder, I would conclude that the Ninth Circuit lacks jurisdiction to review this case.

However, in light of the unique political union of the NMI and the United States, the complexity of the questions involved in these matters, and in the belief that every effort should be made to promote harmony between the NMI courts and the courts established by the Constitution, treaties or laws of the United States, I join in the order of the majority and transmit the notice of appeal and other documents provided in this order, treating it as a petition for writ of certiorari.

_____
LARRY L. HILLBLOM, Special Judge

CLERK OF COURT
SUPREME COURT. CNMI
FILED

91 JAN 28 A10: 03

BY:

FOR PUBLICATION

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, Plaintiff/Appellee, | ) ) ) ) | APPEAL NO. 90-027 CRIMINAL CASE NO. 88-43 |
| vs. | ) ) ) | AMENDED OPINION |
| MARIANO FAISAO MENDIOLA, Defendant/Appellant. | ) ) ) ) | |

Argued August 30, 1990

Counsel for Plaintiff/Appellee:   Ronald A. Hammett
Office of the Attorney
  General
Commonwealth of the
  Northern Mariana Islands
Saipan, MP 96950

Counsel for Defendant/Appellant:   Lecia M. Eason
P. O. Box 404
Saipan, MP 96950

BEFORE:   DELA CRUZ, Chief Justice, BORJA, Justice, and HILLBLOM, Special Judge.

BORJA, Justice:

## FACTS

Galen Mack and Remedios Conley were killed on October 27, 1987, at Obyan Beach, Saipan.

In March 1988, Mario Reyes, while in prison for other crimes, told the police that Mariano F. Mendiola (hereafter Mendiola), the

587

defendant herein, committed the murders of Mack and Conley. Mendiola at the time was also in prison for an unrelated homicide charge.

At the murder trial of Mendiola, Mario Reyes testified that he was present during the kidnapping, robbery, and murders, but that Mendiola committed the offenses.

A psychiatrist and a psychologist performed some evaluation of Mendiola before trial. The psychiatrist, Dr. Ruth Dickson, concluded that Mendiola was borderline retarded. She testified at the trial as a government witness and was cross-examined by defense counsel. The psychologist, Dr. E. Woodyard, concluded that Mendiola was mildly mentally retarded. Although she did not testify at the trial, her written evaluation was introduced into evidence by defense counsel.

The police questioned Mendiola about the murders several times beginning on March 17, 1988. However, no counsel was provided until April 7, 1988. The parties agree that at least five interrogation sessions were had.

Mendiola does not claim that there were any irregularities with the first and third sessions.

He admits that the second, fourth, and fifth sessions were proper in terms of his being read his Miranda[1] rights and his waiver of them. However, interrogation during the second session

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lasted 5 hours and ended late evening. A result of the session was written questions and answers. Mendiola signed each of the 13 pages, after being told to review each page. Mendiola's request to discontinue the session was granted.

In the fifth session, he again signed the pages of the questions and answers.

All the written questions and answers (the confessions), were introduced at trial, without objection.

After the fifth session, the police took Mendiola to the scene of the crime and asked him to reenact the crime. The police took photographs of him while he was reenacting the crime. These photographs were admitted into evidence after Mendiola specifically stated that he had no objection to their admission.

At trial, the government introduced into evidence the bloody and smelly clothes of the victims. Mendiola did object to the introduction of this evidence, properly stating that it would inflame the jury. The court admitted the evidence over his objection.

Mariano Mendiola was convicted on August 24, 1988, of 4 counts of 1st degree murder, 2 counts of robbery, 2 counts of kidnapping, and 1 count of illegal possession of firearms. He is currently serving a life sentence.

## ISSUES PRESENTED

1. Whether the trial court erred in admitting defendant's

confessions, when defendant did not object to their admission.

2. Whether the trial court erred in admitting the photographs of the reenactment of the crimes, when defendant did not object to their admission.

3. Whether the trial court abused its discretion in admitting the bloody and foul smelling clothes of the victims.

## STANDARD OF REVIEW

There were no pre-trial motions to suppress the confessions and the photographs. Neither were any objections made during trial. As such, the standard of review for the first two issues is the plain error standard. Rule 103(d), Commonwealth Rules of Evidence, and Rule 52(b), Commonwealth Rules of Criminal Procedure.

The third issue is subject to the abuse of discretion standard. Commonwealth of the Northern Mariana Islands v. Delos Santos, 3 CR 661 (D.N.M.I. App.Div. 1989).

## ANALYSIS

### 1. Confessions

Mendiola argues that the trial court erred when it admitted into evidence his confessions without first holding a voluntariness hearing. He contends that his confessions should not have been admitted because 1) Mendiola did not know how to read, 2) he was either borderline retarded, or retarded, 3) 6 CMC § 6105(a)(3) was violated, and 4) he had no legal counsel with him at the time of

590

the confessions. He, therefore, concludes that his confessions were not voluntary. We disagree.

Initially, we find that Mendiola's failure to move to suppress the confessions before trial constituted a waiver. Rule 12(b) & (f), Commonwealth Rules of Criminal Procedure. See also United States v. Santiago Soto, 871 F.2d 200 (1st Cir. 1989).

His failure to object to the admission of the confessions during trial is also a waiver by him. Evidence Rule 103(d), and Criminal Rule 52(b). See also United States v. Santiago Soto, supra; United States v. Espinoza-Seanez, 862 F.2d 526 (5th Cir. 1988); United States v. Gonzales, 749 F.2d 1329, 1336 (9th Cir. 1984).

Relief from these waivers may be granted only if necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process. United States v. Greger, 716 F.2d 1275 (9th Cir. 1983).

We, therefore, analyze Mendiola's four reasons[2] to see if there has been a miscarriage of justice, or if the integrity of the judicial process is at stake.

None of the four reasons stated by Mendiola are grounds to

---

[2]During cross-examination on the accuracy of the transcript of Mendiola's confessions, defense counsel extensively examined the circumstances surrounding the taking of the confessions. The record indicates what language was used during the interrogation (English and/or Chamorro), the process and circumstances surrounding the signature of Mendiola on each page, and his ability to read and understand. The record is adequate to conclude that no miscarriage of justice occurred.

exclude the confessions on the basis of involuntariness. To be sure, the first two reasons, i.e., the inability to read and one's reduced mental capacity, are factors which may have a bearing on whether a person is susceptible to coercion, psychological or otherwise, by the police. In the absence of any coercive police activity, however, as the record in this case reveals, those two factors do not affect the voluntariness of one's confession and there is no violation of the due process provision. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515 (1986).

In this case, the record does not show any coercive police activity in obtaining the confessions. The police gave Mendiola coffee when he asked for it, there were breaks in the interrogation sessions whenever he asked, and an interrogation would be stopped as soon as he requested it.

Mendiola's third reason, the violation of the statute,[3] is without merit. Because Mendiola was already in custody on an unrelated matter at the time of the interrogations, he could not be released. The statute does not apply in this situation.

There is also no merit to Mendiola's fourth reason. The absence of legal counsel during the interrogation sessions does not violate any constitutional provision when a defendant has not been

---

[3] 6 CMC § 6105(a)(3) states that it is unlawful

To fail either to release or charge the arrested person with a criminal offense within a reasonable time, which under no circumstances shall exceed 24 hours. . ..

formally charged. Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135 (1986). The record in this case shows that Mendiola was not yet charged with the murders of Mack and Conley when the confessions were elicited.

Because the confessions were voluntary, there has been no miscarriage of justice. Neither is the integrity of the judicial process threatened. We hold that a confession is voluntary if there is no coercive police activity.

However, a confession may still be involuntary, and therefore should be suppressed, if the Miranda waivers were not knowingly and intelligently given. Moran v. Burbine, supra. This issue does not arise in this case since Mendiola acknowledges in his brief that the Miranda warnings and waivers were proper.

Mendiola argues that the written questions and answers are not, and cannot be, transcripts of his confessions. He maintains that they are only the recollections of a police officer as to what he thinks were the questions and answers.

We disagree. As stated in 4 Wharton's Criminal Evidence § 620 (14th ed. 1987)

> A written confession is not objectionable because: . . . it is in question and answer form; . . . it was prepared by another and adopted by the confessor by signature or by an admission as to its correctness. . ..
> A written confession need not constitute a literal transcription of what the defendant said; the substance of what he said is sufficient. Nor is it necessary that the written confession contain all that the confessor said. It is also not necessary that

the written confession be in a language
understood by the defendant, if it has been
translated for him into a language which he
does understand.

(Citations omitted.)

Defense counsel may attack the accuracy of the confessions. The transcript shows that this was done by defense counsel. He cross-examined the interrogating officers, and he made such an argument before the jury. We cannot say that confessions should be excluded from evidence merely because they are in question and answer form.

Mendiola reviewed the questions and answers. He then signed each page of the documents. Mendiola argues that the admission of the confessions with these facts is reversible error. He argues that he does not know how to read. Furthermore, he argues that his ability to understand what he reads is seriously in doubt. He cites to the testimony of the psychiatrist and psychologist in support of his argument.

We are not persuaded by Mendiola's arguments. His arguments should be made, as was done, to the jury to discredit, or to reduce the value of, the confessions.

If the record showed no contradiction to Mendiola's ability to read or comprehend, then we would be persuaded that it was reversible error to have admitted the confessions into evidence. However, what we have here are several contradictory facts on Mendiola's ability to read and comprehend. This is surely within

the province of the jury. They have the duty and responsibility to decide whom to believe. They chose not to believe the experts. In reviewing the transcript of the trial, we noted several contradictory facts that the jury could have found to be more persuasive.

First, in one of the question and answer document, Mendiola crossed out the response of "yes" and wrote in its place the word "no." The question read, "Mr. Mendiola, aren't you at work on October 27, 1987, from 7:30 a.m. to 5:00 p.m.?" Plaintiff's Exhibit 74. The interrogating officer, during cross-examination, testified that he did not scratch the word "yes." It was Mendiola who did it. Tr. 606.

Second, the interrogating officer testified that Mendiola could read. Tr. 620.

Third, at the end of Plaintiff's Exhibit 73 and toward the end of Exhibit 74 are sketches of the area the murders took place. Exhibit 74 is in such detail that the drawings of persons, table, and the path taken are included. In addition, the words "table," "American car," and "As David" are on the sketches. Exhibit 73 is a drawing of where Mendiola parked his car. This map has the words "bunker," "Obyan sign," and "park my car." Mendiola made this map. No other person put any markings on the map. Tr. 666.

Fourth, all the interrogation sessions were conducted in English. Tr. 566. When he was given the questions and answers to review, he would ask for a translation if he was in doubt as to the

meaning.  Tr. 567-568.

Lastly, an employer of Mendiola testified that Mendiola was a good worker capable of doing errands by himself.  Tr. 719.

All the above facts contradict the testimonies of the two experts on Mendiola's ability to read and understand.  It is certainly the province of the jury to decide which facts to believe.

There was no error in the admission of the confessions.

## 2.  Photographs

We find that Mendiola's specific statement that he did not object to the introduction of the photographs constituted a valid waiver by him.  Evidence Rule 103(d), and Criminal Rule 52(b).  See also United States v. Gonzales, supra.  There is nothing in the record to indicate that Mendiola was coerced by the police to participate in the reenactment.  In fact, during the cross-examination of Captain Castro, he testified that just before reenacting the crime, Mendiola refused to have one police officer accompany them.  Captain Castro advised the police officer to leave the place.  Tr. 628.  Furthermore, they do not unfairly prejudice Mendiola.  Their probative aspect is greater than the non-probative aspect of prejudice.  United States v. Layton, 855 F.2d 1388, 1402 (9th Cir. 1988).  They were highly probative on the charges of first degree murder.  His actions before the actual firing of the weapon, how he held the weapon, to what part of the bodies of the victims did he hold the weapon, his actions after he fired the

shots, were all relevant to establish the elements of first degree murder.

Even had a timely objection been made, the trial court would not have abused its discretion to admit them into evidence. They fairly depict the act of the murders. 3 Jones on Evidence, § 15:14 (6th ed. 1972); 3 Wharton's Criminal Evidence, § 603 (14th ed. 1987).

We hold that the statement of no objection to the admission of the photographs constituted a valid waiver by Mendiola. He does not have a right to now object. The admission was not a miscarriage of justice, nor did it damage the integrity of the judicial process.

### 3. Clothes

The admission of the bloody and smelly clothes should not have been allowed. It was an abuse of discretion for the trial court to admit them since, although relevant, they would have inflamed the passion of the jury. Their non-probative aspect far outweighed their probative aspect. United States v. Layton, supra.

However, to say that the trial court erred in allowing the introduction of the bloody and smelly clothes does not end the inquiry. We also need to determine if the error was harmless. See Rule 52(a), Commonwealth Rules of Criminal Procedure. Rule 52(a) states that an error is to be disregarded if it does not affect substantial rights. To determine if substantial rights have been affected, "the entire record must be considered and the probable

effect of the error determined in the light of all the evidence."
C. Wright, Federal Practice and Procedure: Criminal 2d § 854 (1982).

In reviewing the whole record, we conclude that the introduction of the bloody and smelly clothes was harmless. The confessions and the photographs of the reenactment are overwhelming in showing Mendiola's guilt. We are convinced that the error had a very slight effect on the jury. The outcome would have been the same despite the error.

## CONCLUSION

The judgment of conviction is AFFIRMED.

Jose S. Dela Cruz
Chief Justice

Jesus C. Borja
Associate Justice

Larry L. Hillblom
Special Judge